**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

THOMAS McNALLY            :
    Plaintiff,            :
                          :      CIVIL ACTION NO.
v.                        :      07-cv-1497(JCH)
                          :
STEPHEN F. STEWART, ET AL.,   :
    Defendants.         :      MAY 15, 2009
                          :

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. NO. 20)**
**AND MOTION TO STRIKE (DOC. NO. 28)**

## I.    INTRODUCTION

Plaintiff Thomas McNally brings this claim against the defendants Stephen
Stewart, Keith Truex, and Sandra Truex (collectively "defendants"),[1] each in their
individual and official capacities, alleging violations of his rights pursuant to 42 U.S.C.
§1983 and 1988.  McNally was expelled from his position as Assistant Chief of the
Chesterfield Fire Company of which the defendants were members.  McNally claims
that he was denied his procedural and substantive due process rights in violation of the
Fourteenth Amendment.  Defendants move for summary judgment on McNally's claim.
Defendants also move to strike certain affidavits submitted by McNally in his opposition
to the Motion for Summary Judgment.

## II.    STANDARD OF REVIEW

In a motion for summary judgment, the burden is on the moving party to

---

[1]Despite the fact that he did not name them as parties in his Complaint, McNally asserts that the
Chesterfield Fire Company is also a party to this lawsuit because the defendants are being sued in both
their official and individual capacities.  Mem. in Opp. at 15.  McNally cites no authority supporting this
theory that a corporation is a party to a case despite not being named in the complaint.  Thus, the court
declines to treat the Chesterfield Fire Company as a party now.

establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000).  Once the moving party has met its burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor in order to defeat the motion. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

Generally, when assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38.  "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party."  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000).  "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

## III.    FACTUAL BACKGROUND[2]

Chesterfield Fire Company (the "Company") is a volunteer fire company that was incorporated in Connecticut in 1947.  It is a non-profit corporation organized to provide fire and rescue services to its surrounding community in Montville, Connecticut.  The Company is one of four active volunteer fire companies that serve the Town of

---

[2] For the purposes of the instant Motion, the court accepts facts undisputed by the parties as true and resolves disputed facts in favor of the non-moving plaintiff, where there is evidence to support his allegations.

Montville. The Company owns the land upon which the station rests.  It also owns the

station, the ambulance, service truck, and Chief's vehicle.  The Town of Montville owns

the two fire engines, the rescue truck, and a brush truck.

The volunteer fire fighters are unpaid but receive a nominal annual stipend from

the Town of Montville ranging from $500 to $1,200 per year depending on the

volunteer's level of certification.  There are more volunteer fire fighters in the Town of

Montville than paid, professional fire fighters.  The State of Connecticut has, by statute,

extended to volunteer fire fighters some degree of immunity from liability and made

them entitled to private workers' compensation benefits under Connecticut's statutory

scheme.

The Company receives approximately $80,000 annually from the Town, which is

roughly one-third of the Company's total budget.[3]  Stewart Aff. ¶ 7.   The Company's

budget is vetted through the Town Finance Committee, the Public Safety Commission,

the Mayor's office, and is ultimately approved by the Town Council.  At least a portion of

the Company's revenues is from bingo fundraisers.[4]

The Company's internal governance is regulated by a series of officers elected

---

[3] McNally asserts that this figure cannot be true given the fact that the Town pays the salaries of any full-time paid firefighters.  McNally Aff. ¶ 9.  Because the court must resolve disputed facts in favor of McNally it will assume that this $80,000 figure does not include the salaries of full-time firefighters.

[4] Defendants assert that the "majority" of the revenue comes from ambulance billings and bingo. Stewart Aff. ¶ 13.  However, McNally asserts that the ambulance billings are used to sustain that function and do not produce much revenue. McNally Aff. ¶ 6.  He also states that the profits from bingo are mostly used to pay the mortgage and for social functions. Id. ¶ 10.  It bears noting that in the minutes from the March 12, 2008 Public Safety Commission meeting, which were submitted by McNally, it states that the Company conducted upgrades on the firehouse in the amount of $150,000. Mem. in Opp. Exh. 6.  The minutes state that money for the upgrades came from "a successful bingo fundraising effort, as well as from other sources, not from the Town budget."  Id.  Thus, there is evidence in the record that the Company, at least on occasion, generates a significant amount of revenue from bingo fundraisers and uses the revenue for more than just the mortgage and social functions.

from the membership of the Company, as well as a written constitution and by-laws. The by-laws establish certain roles and functions for the Company's officers, including the formation of a Disciplinary Review Board ("DRB") to investigate all written charges of wrongdoing by a company member.  The DRB is comprised of line officers, trustees, and the president.  The line officers consist of the Chief, Deputy Chief, Assitant Deputy Chief, Fire Captain, Four Fire Lieutendants, EMS Camptain, EMS Lieutenant, Fire Police Captain, and the Fire Police Lieutentant.  The Board of Trustees is made up of three members with two or more years experience. The trustees are elected by the membership.  The President of the Company is Richard Rothholz.

McNally was initially accepted to work at the Company on February 4, 1992, when McNally was sixteen years old.  In 1992, McNally was either expelled or resigned as a member of the Company.  In 1999, McNally re-joined the Company where he worked as a volunteer.  In the following years, McNally ran for and won elected offices with the Company, including Assistant Deputy Chief.

Defendant Stephen Stewart is, and at all times mentioned herein, the Chief of the Company.  Defendant Keith Truex at all relevant times was a member of the Company.  Defendant Sandra Truex was, at all relevant times, the Assistant Financial Secretary of the Company and married to defendant Keith Truex.

During the Fall of 2004, a series of events began involving McNally.  On September 28, 2004, the Company Line Officers wrote a letter to the DRB and the Company recommending the removal of McNally from his position as Assistant Chief. The letter represented that it was being submitted as a result of several Company line officer meetings that were held during the month of September.  The meetings were

4

held, according to the letter, to "address a growing concern that [McNally] is deliberately attempting to undermine the trust and authority of the other line officers of the [Company] and that of the Chief [Stewart] in particular."  Mem. in Supp. Exh. G.  The letter cited other concerns that McNally was constantly spreading rumors which was "foster[ing] an atmosphere of distrust throughout the Company."  Id.  This letter was signed "the Chesterfield Fire Company Line Officers," which gave the appearance that all the line officers agreed with the contents of the letter.  However, Norman Sylvia, a line officer with the Company, represents that the letter was never presented to him and he never adopted its contents.  Norman Sylvia Aff. ¶ 5.

After reviewing the September 28 letter from the line officers, as well as two letters of complaint regarding McNally spreading rumors,[5] on October 3, 2004, the DRB recommended that McNally be removed from his position as Assistant Chief and be placed on probation for six months to "provide him time to come to terms with developing the means to determining the appropriateness of when and where not to disclose company personnel matters."  Mem. in Supp. Exh. H.  The DRB also recommended that Chief Stewart's 30-day suspension of McNally remain.[6]  He was

---

[5] One letter of complaint was from Meghan Leonard stating that McNally had told an officer of another town fire company that she and another member of the Company were "messing around" in the parking lot.  She also stated that McNally told two Company members that she would be joining another town fire company and take all the younger Company members with her.  She expressed that she felt McNally was "purposefully inflicting discredit upon her reputation."  Mem. in Supp. Exh. H.

The second letter of complaint was from Tammy Bargnesi, who stated that McNally commented to her that Chief Stewart's leadership was "weak and inadequate."  She also said that McNally constantly badmouthed other members of the Company and that he made "harmful and hurtful" statements about several Company members and that he spent much time sharing those comments with younger members of the Company.  Id.

[6] It is not clear to the court when, or for what reason, Chief Stewart issued this 30-day suspension. However, the by-law indicate that the Chief is permitted to "suspend any line officer, executive officer, or member for a period of up to 30 days for any infraction of the Company's by-laws, for failure to carry out

thus suspended for 30-days and placed on probation for six months.  McNally asserts that approximately two weeks after he was suspended, Chief Stewart said he could come back, and the Company voted not to remove him from his position.  McNally Aff. ¶ 49.

On or about June 18, 2005, McNally removed defendant Sandra Truex's gear from her locker, claiming that she did not have a current physical on file.  He notified her of this in a letter. Mem. in Supp. Exh. I.  McNally asserts that the Occupational Safety and Health Administration ("OSHA") requires that all members of the Company pass a physical.  On June 18 and June 20, 2005, Ms. Truex sent letters to Chief Stewart notifying him that McNally had accessed and revealed her confidential medical records to the Town of Montville's Fire Marshall.  Mem in Supp. Exh. K.  In both of these letters she requested a review of McNally's actions.  Id.  Subsequently, on June 21, 2005, Mr. Truex sent a letter to Chief Stewart, the Line Officers, and the Board of Trustees reiterating the situation regarding McNally removing Ms. Truex's gear from her locker.  Id. at Exh. L.  In the letter, he questioned whether a policy requiring everyone to pass a physical even existed.  He also inquired as to whether McNally's act of revealing Ms. Truex's medical records to the Fire Marshall was in violation of HIPPA.

On January 24, 2005, the DRB reviewed various written complaints it had received concerning McNally and recommended that he be placed on a period of probation for a period of one year.  McNally alleges that these written complaints were initiated by "Mr. Truex or his known associates."  L. R. 56(a)(2) Stat. ¶ 33.  McNally also

---

the commands of the officer in command, or for action unbecoming an officer or member of the Company."  See Mem. in Opp. Exh. 11 By-Laws Article V, Section 2.

asserts that, though he was put on probation for one year at the DRB meeting, the probation was not upheld.  Id.   On March 7, 2006, Keith and Sandra Truex resigned as officers of the Company citing, among other things, McNally's one-year probation.

On April 28, 2006, the Company held its Annual Banquet at the Polish Club. After the Banquet, Ms. Truex wrote a letter to the DRB stating that she observed McNally drinking a shot with two underage members of the Company.  Mem. in Supp. Exh. N. Mr. Truex wrote a similar letter stating what Ms. Truex observed as well as reciting incidents that involved other adult members drinking alcohol with underage members.  Id. at Exh. P.  One of the underage drinkers, Brandon Krupinski, wrote a letter stating that he felt pressured by McNally to take the shot.  Id. at Exh. Q.

On May 5, 2006, the DRB voted to expel McNally from the Company for conduct unbecoming an officer because he provided alcoholic drinks to underage members of the Company.[7]  The DRB also voted to suspend each of the underage members that were drinking for thirty days.  Six DRB members were present at this meeting, four of whom voted in favor of this decision.

The Company membership voted defendant Keith Truex into office as Assistant Chief on December 5, 2006.

McNally asserts that as a result of his expulsion the defendants deprived him of his right to procedural and substantive due process in violation of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983.

---

[7] McNally was also criminally charged with delivery of alcohol to a minor, which charges were subsequently nolled.  Id. at Exh. V.

IV.    **DISCUSSION**

Defendants first move to strike portions of McNally's own Affidavit , as well as portions of Affidavits he submitted from Norman Syliva, Alison Sylvia, Steven Loiler, and Kevin Loiler in support of his Opposition to the Motion for Summary Judgment. Moreover, Defendants move for summary judgment on the grounds that (1) the defendants are not state actors; (2) McNally has failed to state a procedural due process claim; (3) McNally has failed to state a substantive due process claim; and (4) McNally's claim for section 1983 civil conspiracy fails as a matter of law.

A.    <u>Motion to Strike</u>

Defendants move to strike certain portions of the Affidavits submitted in support of McNally's Opposition to the Motion for Summary Judgment, as well as the corresponding portions of the plaintiff's Local Rule 56(a)(2) Statement because the Affidavits fail to comply with that Rule.

Affidavits submitted in support of summary judgment must comply with the requirement of Fed. R. Civ. P. 56(e).  Pursuant to Rule 56(e), affidavits must "be made on personal knowledge," must "set forth such facts as would be admissible in evidence," and must "affirmatively state that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P.  56(e). "They should not contain arguments or conclusions of law." <u>Delacroix v. Lublin Graphics</u>, 993 F. Supp. 74, 80 (D. Conn. 1997). "When an affidavit does not comply with these basic requirements, the offending portions should be stricken or disregarded by the court."  <u>Id.</u>  "However, an entire affidavit need not be stricken if it includes some inadmissible material."  <u>Amatulli v. People's Bank</u>, 917 F. Supp. 895, 904 (D. Conn. 1996).  "The court may simply

8

disregard the inadmissible material."  Id.

With respect to McNally's Affidavit, defendants are correct in statating that some of the assertions in his Affidavit are not based on personal knowledge.  For instance, in paragraph 60, he states that in February 2006, Stewart admitted to driving the ambulance after drinking though no action was taken for this misconduct.  This statement does not indicate any basis in personal knowledge.  See Kamen v. American Telephone and Telegraph Co., 791 F.2d 1006, 1011 (2d Cir. 1986).  Thus, the court will disregard bald assertions like this one in McNally's Affidavit because such statements "lack sufficient foundation to permit its use to defeat a properly supported motion for summary judgment."  Rossi v. West Haven Bd. Of Educ., 359 F.Supp.2d 178, 182 (D. Conn. 2005).

The court notes, however, that it declines to strike all of the requested portions of McNally's Affidavit as some of them indicate that he has personal knowledge of the occurrences.  For example, in paragraph 69, McNally asserts that he received a letter shortly after the May 5, 2006 meeting at which he was expelled.  He states he was denied any notice of this meeting and an opportunity to speak on his behalf.  The defendants assert that this paragraph should not be considered by the court, but the court sees no reason why it should not be.  Defendants argue this is an impermissible legal conclusion.  While the defendants may disagree that McNally was not provided with notice and opportunity to be heard, McNally asserts his own personal experience is that he did not receive notice of his charges or an opportunity to speak.  This is a disputed fact that McNally can testify to at trial, if a trial is necessary.  Accordingly, the court will consider statements like this one that are steeped in personal knowledge,

9

and, as with any motion for summary judgment, it will also look for other evidence in the record "that would allow a jury to find in his favor in order to defeat the motion." Graham, 230 F.3d at 38.

Similarly, with respect to the other Affidavits submitted by McNally, the court will only consider statements based on personal knowledge that are set forth in facts that would be admissible evidence.  The court recognizes that there are some statements in each of the remaining Affidavits that are not admissible.  For instance, in Norman Sylvia's Affidavit, he makes statements that the by-laws and other procedures were not followed at certain meetings without citing the by-laws. See, e.g., Norman Sylvia Aff. ¶ 16, 17, and 20.   The court will disregard any conclusory statements like this and will instead, look to the by-laws to determine if they were followed or not.  In all, the court will disregard any inadmissible material in the Affidavits and will not rely on them in arriving at its decision.  See Amatulli, 917 F.Supp. at 905.

Accordingly, for the foregoing reasons, the defendants Motion to Strike is denied in part and granted in part.

      B.    Due Process

The court now turns to McNally's allegations the defendants violated 42 U.S.C. § 1983 by expelling him from the Company without the process he was due under the Fourteenth Amendment.  The Fourteenth Amendment's Due Process Clause prevents state officials from depriving "any person of life, liberty, or property, without due process of law."  U.S. Const., amend. XIV, sec. 1.  Section 1983 only applies to the deprivation of rights that occur "under color of state law."  42 U.S.C. § 1983.  "In cases under section 1983, 'under color' of law has consistently been treated as the same thing as

10

the 'state action' required under the Fourteenth Amendment." Rendell-Baker v. Kohn, 457 U.S. 830, 838 (1982). This has been interpreted to mean that section 1983 cannot be used to challenge mere private conduct. Am. Mfr. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999). "The traditional definition of acting under color of state law requires that the defendant in a section 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" West v. Atkins, 487 U.S. 42, 49 (1988) (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).

Defendants argue that summary judgment should be granted because they are not state actors. Indeed, if the defendant's actions in expelling McNally cannot fairly be seen as state action, then the inquiry ends. See, e.g., Rendell-Baker, 457 U.S. at 838. Thus, the court must first determine whether defendants were acting under color of state law when they expelled McNally.

There is no single test to determine who is a state actor. Horvath v. Westport Library Ass'n., 362 F.3d 147, 151 (2d Cir. 2001); see also Lebron v. National Railroad Passenger Corp, 513 U.S. 374, 378 (1995) (Supreme Court stating "it is fair to say that our cases in deciding when private action might be deemed that of the state have not been a model of consistency"). "Rather there are a 'host of facts that can bear on the fairness of . . . an attribution' of a challenged action to the State." Horvath, 362 F.3d at 151 (quoting Brentwood Academy v. Tennessee School Athletic Ass'n., 531 U.S. 288, 295-96 (2001)).

"State action may be found in situations where an activity that traditionally has been the exclusive, or near exclusive function of the State has been contracted out to a

11

private entity." Id.  For instance, prison employees have been considered state actors,

West v. Atkins, 487 U.S. 42 (1988),  because "only the State may legitimately imprison

individuals as punishment for the commission of crimes."  Horvath, 362 F.3d at 151.

Similarly, Amtrak, though a private corporation, is considered a state actor for First

Amendment purposes because it was created "explicitly for the furtherance of federal

government goals," and the government "retains for itself a permanent authority to

appoint a majority of the directors of that corporation."  Lebron, 513 U.S. at 397-399

(1995).

        However, the test to determine what is considered state action is not as simple

as determining whether the activity is traditionally seen as a government function.  For

instance, in Rendell-Baker v. Kohn, 457 U.S. 830 (1982), in which a privately operated

school was sued by former employees who were allegedly terminated by the director of

the school in violation of their First Amendment rights, the Supreme Court held that,

despite the fact that the school received funds from various federal and state education

agencies, the employer did not act under color of state law for the purposes of section

1983.   The court relied on the fact that the "decisions to discharge the petitioners were

not compelled or even influenced by any state regulation."  457 U.S. at 841.  Moreover,

the court determined that the "school's fiscal relationship with the State is not different

from that of many contractors performing services for the government."  Id. at 843.

        Determining whether the activity is traditionally left to the state is not the only

inquiry.  See, e.g., id. at 842.  For instance, in Horvath, the court applied a test outlined

in Lebron to determine whether or not a corporate entity qualifies as a state actor in

finding that a town library and its officials were state actors for the purposes of a former

employee's section 1983 due process claim.  Horvath, 362 F.3d at 153.  The court

stated that a private corporate entity can only be considered a state actor if:

> "(1) the government created the corporate entity by special law, (2) the
> government created the entity to further governmental objective, and (3) the
> government retains permanent authority to appoint a majority [of] the directors of
> the corporation."

Id.  The Horvath court cited Hack v. President & Fellows of Yale Coll., 237 F.3d 81, 84

(2d Cir. 2000), in which the Second Circuit utilized this test to determine that Yale did

not qualify as a state actor because it failed on the third prong: Connecticut only

retained the right to appoint two of the nineteen board members, which was not the

majority, and therefore "a long way from control."  237 F.3d at 84.

McNally argues that this case is akin to Janusaitis v. Middlebury Fire

Department, 607 F.2d 17 (2d Cir. 1979), in which the court held that a volunteer fire

department's dismissal of one of its volunteer fire fighters constituted state action for

First Amendment purposes.  The court relied on the fact that "[f]ire protection is a

function public or governmental in nature which would have to be performed by the

Government but for the activities of volunteer departments."[8]  607 F.2d at 24 (internal

quotations omitted).  Not only did the court consider fire protection as something that is

traditionally a function of the state, but it also took note of the level of involvement the

Town had in the department's activities.  For instance, it noted that the Middlebury Fire

Department occupied land and buildings owned by the Town as well as used fire

fighting equipment owned by the Town.  Furthermore, the Town Board of Selectmen

---

[8] It bears noting that the Janusaitis court also relied on a Connecticut statute that authorized
agreements with volunteer fire departments stating that such a statute "implicitly recognizes that fire-
fighting is essentially the exclusive function of government . . . ."  Janusaitis, 607 F.2d at 24.  Neither party
cites this statute, or a similar one, in this case.

oversaw the operations of the Middlebury Fire Department and "retain[ed] final approval of the selection of the Chief, who was the principal actor in the disciplinary action against the appellant." Id.

Defendants argue that Janusaitis is distinguishable because in that case the town owned the land, buildings, and equipment used by the volunteer fire department, and the Town Board of Selectmen had the final vote of approval of the election of the Chief.  They argue that the Company is distinguishable because it owns the land on which the station rests, the station, the ambulance, and the service truck.  They further argue that, while the Town of Montville does own two fire trucks, the rescue truck, and a brush truck, it does not have any authority to approve the Chief or set rules and regulations for the volunteer companies.  Mem in Supp. at 6.  In fact, the Company creates its own by-laws and elects its own officials.  Mem. in Opp. Exh 11.

The question of whether defendants acted under color of state law is a close one.  Fire protection is traditionally a state function.  Janusaitis, 607 F.2d at 22.  While that fact weighs in favor of finding that the defendants acted under color of state law, the inquiry does not end there.  In Janusaitis, the Second Circuit relied on the "symbiotic relationship" test governed by Burton v. Wilmington Parking Auth., 365 U.S. 715, 725 (1961) and the "public function" test outlined in Jackson v. Metropolitan Edison, 419 U.S. 345, 353 (1974).[9]  While Janusaitis still appears to be good law, the court chooses to follow the Lebron test followed by the Second Circuit in Hack and Horvath because these are more recent cases that, though they do not involve

---

[9] It bears noting that both parties here addressed the "symbiotic relationship" test.

14

volunteer fire fighters, address the issue of how to determine whether or not a corporate entity, like the Company, qualifies as a state actor.

   In applying the Lebron standard laid out in Horvath, the court finds that, as was the case in Hack, the Company, which is a non-profit organization like Yale, does not satisfy the third prong.  The record does not reveal that any of the members of the Company are appointed by the Town.  Indeed, the by-laws reveal that all of the Company officials are elected by its members.  The Board of Trustees, of which there are three members, specifically is an elected body.  Mem. in Opp. Exh 11, By Laws Article VIII, Section 19.  One member is elected each year and serves for a total of three years. Id.  The Town does not, as it did Horvath, appoint the majority of trustees. In fact, on the record before it, it does not appear to this court that the Town appoints any of the Company's trustees or officers, not even the Chief.  Cf. Janusaitis, 607 F.2d at 24 (finding state action where the Town appointed the Chief of the Fire Department). Thus, under the Lebron standard, although the first two elements can be satisfied, the fact that the Town does not retain any authority to appoint the directors or officers of the Company, let alone the "majority" of them, indicates that defendants do not satisfy the third prong and cannot be considered state actors.

   The court notes that the only evidence of state regulation in the record is that the Town provides some of the equipment, provides at least a third of the budget, and approves the Company's budget.  As discussed in Rendell-Baker, government funding is not enough to attribute actions to the state.  457 U.S. at 840 ("the school's receipt of public funds does not make the discharge decision acts of the state).  Moreover, the Rendell-Baker Court also relied heavily on the fact that the "decisions to discharge the

petitioners were not compelled or even influenced by any state regulation," and the state "showed relatively little interest in the school's personnel matters."  Id. at 841. However, "the State need not have coerced or even encouraged the events at issue in the plaintiff's complaint if 'the relevant facts show pervasive entwinement to the point of largely overlapping identity' between the state and the entity the plaintiff contends is a state actor." Horvath, 362 F.3d at 154 (quoting Brentwood Academy, 531 U.S. at 303)). There is nothing in the record indicating that anyone other than Members of the Company, let alone the Town, played a role in McNally's discharge.  In fact, the by-laws, created by the Company, set out detailed policies for any disciplinary action to be taken against a member. See Mem. in Opp. Exh. 11, By-Laws Article VIII.  While this is not dispositive, there is likewise nothing in the record that would support a finding that there is "pervasive entwinement to the point of overlapping identity" between the Company and the Town.  Thus, because there is no evidence in the record that the Company is pervasively entwined with the State and neither the State nor Town government appoints a majority of the Company's directors, the defendants, as a matter of law, were not acting under color of state law when they expelled McNally from the Company.

Because defendants are not state actors, McNally's claims that he was denied procedural and substantive due process must be dismissed because he has not stated a claim for relief under section 1983.  Similarly, "[t]o state a claim against a private entity on a section 1983 conspiracy theory, the complaint must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act."  Spear v. West Hartford, 954 F.2d 63, 68 (2d Cir. 1992); see also

Ciambriello v. County of Nassau, 292 F.3d 307, 324-5 (2d Cir. 2002).  As such, claims for civil conspiracy also require that there be more than just private conduct.  Given there is nothing in the record to evidence action by any Town official, the civil conspiracy claim must also be dismissed because defendants, as a matter of law, are not state actors.

## V.       CONCLUSION

For the foregoing reasons, defendants' Motion for Summary Judgment (Doc. No. 20) is **GRANTED**.  Defendants' Motion to Strike is **GRANTED** in part and **DENIED** in part (Doc. No. 28).

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 15th day of May, 2009.

 /s/ Janet C. Hall          
Janet C. Hall
United States District Judge

17